

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00574-CV

_____

## IN THE INTEREST OF J.D., R.D.-G., K.G., AND L.G., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-698605-21

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant R.G. (Father) appeals the termination of his parental rights to R.D.-G. (Roger),[2] K.G. (Kenneth), and L.G. (Lacy) and in which Appellant K.D. (Mother) appeals the termination of her parental rights to J.D. (John),[3] Roger, Kenneth, and Lacy following a four-day bench trial.[4] The trial court terminated Father's and Mother's parental rights based on clear and convincing evidence of two predicate grounds—endangering environment and endangering conduct—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (b)(2). In a single issue, Father challenges the legal and factual sufficiency of the evidence to support the best-interest ground. Mother's court-appointed attorney filed an *Anders*[5] brief, stating that he did not find any legally nonfrivolous ground constituting error. Because legally and factually sufficient

---

[1] *See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of an appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after a notice of appeal is filed).

[2] *See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). We use aliases to refer to all four children.

[3] John's father passed away while the case was pending.

[4] In the initial trial, the trial court declared a mistrial on October 10, 2024. The final trial dates were March 13, 2025; April 7, 2025; May 14, 2025; and October 20, 2025.

[5] *Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967).

evidence supports the trial court's best-interest finding that Father challenges and because Mother's appeal is frivolous, we affirm the trial court's judgment terminating Father's parental rights to Roger, Kenneth, and Lacy and Mother's parental rights to John, Roger, Kenneth, and Lacy.

## II. Background

Because Father's status changed throughout the seven months that the final trial spanned and because not every witness gave updated testimony at the various trial settings, we summarize the testimony by trial date, focusing on Father and providing information on Mother only when necessary to assist with the best-interest analysis.

### A.    The March Trial Setting

Patricia Gonzalez, an investigative supervisor with the Department of Family and Protective Services (the Department), testified that there were four intakes during this case. The first intake occurred on September 27, 2023, and raised concerns regarding instability in the home, Mother's being under the influence while caring for the children, and the lack of basic necessities. The second, third, and fourth intakes occurred close in time beginning around November 7 to 9, 2023, and raised similar concerns. All of these concerns dealt with Mother because Father was incarcerated.

During its investigation, the Department had ongoing concerns for the children's stability, Mother's abandonment of them, and parental drug use. After Mother and the children were evicted from their home, fictive relatives wanted to take

possession of the children; Mother allowed the children to be placed with Ms. Latimer.[6] But within twenty-four hours, Ms. Latimer had dropped off the children at a fire station. When reached, Mother indicated that the children could not be returned to her because she was in Oklahoma and later said that she was in Dallas; when asked for an address, she stopped responding to the Department. The Department thereafter obtained an emergency protective order to take custody of the children.

Father testified that he had known Mother since they were kids and that he knew she struggled with "very high anxiety" that caused her to "run if she fe[lt] too much pressure." Father said that Mother could be manipulative at times. Despite Mother's mental-health issues, which he said he had only heard about but had not witnessed, Father claimed, "She [wa]s a great mother." His stance was that she had "[n]ever once" put their children at risk. He was, however, worried about Mother's failure to appear for hearings and for the March trial setting. And he admitted that by not coming to court, Mother was leaving her children with the Department.

Father admitted that he had been incarcerated the whole time that the case was pending and that he was currently incarcerated for deadly conduct. He believed that

---

[6]She was initially identified as the paternal grandmother. It was later posited that the woman was the mother of a man who was not related to the children.

4

he had been incarcerated "eight or ten times" during his life;[7] he agreed that was a lot but did not think that was a pattern. He did not believe that his incarceration put his children at risk. But he agreed that it was impossible for him to raise his children while he was incarcerated and that he cannot "get that time back." He conceded that he had made some mistakes in life and in parenting[8] but believed that he had "grown tremendously."

Father said that while in prison, he had taken a class on cognitive intervention (which he explained was "like anger management") and the CHANGES course (which he said "focuse[d] more on . . . your background") that included parenting and a drug program. He claimed that he had never had a drug problem; he admitted smoking marijuana recreationally in California but said that he had stopped after Kenneth's birth[9] upon learning that marijuana was illegal in Texas.

---

[7]Later, he testified that he had been in jail two or three times prior to his current incarceration.

[8]One thing that he opined he had "done wrong" was to take a plea deal instead of fighting his charges, which he believed he "could have beat[en]." He admitted that he was guilty of "[u]nloading a firearm" but claimed that he should not have "sign[ed] for the time that [he had] signed for." When he signed his plea deal, he believed that he would only have to be in prison for six months or a year at most. It is unclear why Father believed that he would spend such a short time incarcerated when his July 29, 2022 judgment for "deadly conduct – discharge firearm at individual" stated that the terms of his plea were "3 TDCJ-ID" and reflected that he was sentenced to three years' confinement.

[9]For reference, John was born in 2016, Roger was born in 2019, Kenneth was born in 2020, and Lacy was born in 2021.

5

When asked if Mother had drug issues, Father would not readily concede that she had drug problems, only that she used drugs. He explained,

> Before I left [for prison,] there wasn't no drug habits. There was no her putting any drugs before the kids. There wasn't no she had to be intoxicated to make it through a day. All -- all of that -- all of that is brand new, you know.
>
> If she was going to smoke, [I told her to] go outside[, and she did.] . . . There was no -- it wasn't because she was stressing. It wasn't for her to make it through a day, you know. So I never saw it as a drug problem.

Father testified that Mother did not stop using drugs after Kenneth's birth but went outside their home to smoke marijuana. Father could not say whether it was good parenting on his part to allow Mother to smoke marijuana outside and then come back into the home with the children. Father was unaware that Mother had used drugs while pregnant until "[i]t came out in [Kenneth's or Lacy's] poop or something like that."[10] He was disappointed in her and agreed that it was bad for Mother to use drugs while pregnant but said that she had been accustomed to smoking marijuana in California and that he was her husband, not her father.

Father admitted that his children were in the Department's care due to a lack of parenting. And despite his earlier statement that his incarceration did not put his children at risk, he admitted that his incarceration had put the children in danger, stating, "If I'm not there to protect them, I for sure feel like they're in danger."

---

[10]Father said, "It was in one of their poops. I'm not a hundred percent sure which kid it was."

Father testified that his children never had behavioral issues until he went to prison. He believed that they had been through trauma.

The children called Father multiple times a day and visited him in prison four times per month from December 24, 2022, to June 2023, but then Mother's car broke down, and he stopped wanting visitors. After the children were brought into the Department's care in November 2023, they were not allowed to visit him in prison.

As of the March trial setting, Father testified that he had no relationship with Mother. Father opined that if his children were returned to him, his plan was "[t]o be a father," "[t]o get back on track," and to be present. He believed that the best thing is for the children to be with their parents, but since he was still in prison, he asked the trial court to deny the Department's request to terminate his parental rights and to instead name a family member as the conservator of his children.

## B. The April Trial Setting

At the April trial setting, Briana Spears, the permanency specialist assigned to the case, testified that the Department's concerns included that Mother had left the children with caregivers "that she was not knowledgeable of." Spears noted that Father had prior criminal history. She developed a family plan for Mother and one for Father despite his incarceration and the resulting limited availability of services. Spears gave the plan to each parent in person and went over it with them.

Spears testified about Mother's failure to successfully complete her services. Spears requested that Mother take monthly drug tests from December 2023 to April

7

2025, but Mother had not shown for any of them, resulting in fifteen presumed positive tests. Mother admitted to marijuana use. Mother attended approximately fifty percent of the visits that she was offered, but the visits were chaotic with her being unable to manage the children's problematic behaviors. As of the April trial date, Mother had provided various addresses to the Department and had an issue with homelessness and couch surfing.

Spears testified that the children should not be returned to Father and Mother because they had not demonstrated that they could provide a safe and stable environment for the children. The Department had the same concerns about Mother—drug use and neglect of the children—that it had when initiating the case. And Spears was concerned about Father's potential for future convictions based on his prior criminal history.

Spears testified that John, Roger, and Lacy had been living in a two-parent foster home since November 2023 and that the children were bonded to that placement. Spears said that Kenneth had been in a separate placement since March 2024 as a result of his removal from his prior placement after fighting the foster parents.[11]

---

[11]The permanency report that was signed July 25, 2024, and that appears in the clerk's record states that Kenneth had initially been placed in the same foster home as his siblings but was moved to a therapeutic foster home in March 2024.

Spears described the children and summarized how they were doing:

- Eight-year-old John was described as "very mild mannered" and was doing exceptionally well in school as he was on the A, B honor roll and was involved in an after-school educational enrichment program. When he came into the Department's care, he was academically delayed.

- Six-year-old Roger had made "great progress" overall though he still needed some redirection at times. He was doing well in his foster home and no longer had problematic behaviors at school. When he came into care, he had trouble sitting in class and listening to instructions and had twice attempted to run away from school.

- Five-year-old Kenneth, who had the worst behavioral issues of the four children, had improved after his school had placed him in a program to help him self-regulate. He initially could only attend school from 8:00 a.m. to 11:00 a.m. because he became irate and disrupted the class when it was time to transition to a different activity, but he had improved and was able to stay at school until 12:45 p.m. He was doing "really well" in the therapeutic foster home.

- Three-year-old Lacy, who was the baby of the group and acted like it, "kind of r[an] the boys." She did not exhibit any problematic behaviors but needed to be verbally redirected frequently. Spears opined that some of the behaviors that Lacy was having would be improved when she started attending a pre-K program.

Spears said that John, Roger, and Kenneth were involved in behavioral therapy and that John also attended individual therapy. All four of the children had undergone psychological evaluations, and Kenneth had also undergone a psychiatric consult. Kenneth had been prescribed medication to assist with his behavior.

Spears stated that the adoption-motivated foster home was willing to adopt all four children and opined that it was able to meet all four children's present and future physical, emotional, and financial needs. The Department's plan as of the April trial

9

date was to continue to explore the familial placements in California,[12] and if those fell through, then to proceed with allowing the current foster home to adopt all four children. The Department sought to be named as permanent managing conservator with the right to place the children for adoption.

### C.     The October Trial Setting[13]

Spears testified at the October trial setting that the Department was still requesting termination of the parental rights of both parents. She gave updates on the parents' service-plan progress.

She said that Father had been released from prison in late April 2025 and that his May 14, 2025 hair-strand test was positive for cocaine. Father's August 12, 2025 hair-strand test was also positive for cocaine, and the amount was higher than the May 14 amount. Spears talked to Father about his two positive drug tests. As to the May 14 test, Father said that there was no way that the results were correct, that he was not sure how that had happened, and that it could have come from someone whom he had been around. Father did not provide an explanation for the positive test in August.

---

[12]The children had thirty-minute weekly video visits with Paternal Grandfather and his wife.

[13]No testimony was given and no evidence was admitted during the May trial setting. At that setting, the trial court found good cause to extend the ninety-day period of time to render a final order because Father had been released from incarceration and had "worked diligently both before and after his release to complete the services on the family plan of service" and because it would be in the children's best interest.

Mother's June 30, 2025 hair-strand test was positive for cocaine, and she did not submit to requested drug tests in July or August 2025, even though she had been informed that failing to take a drug test would result in a presumed positive. Mother denied using cocaine and told Spears that she lived with someone (Father's mother) who possibly used cocaine and that there could have been residue left behind in the home. Spears opined that an environment with cocaine would be dangerous for the children's health and safety.

Spears testified that after Father's release from prison, he had completed parenting classes, he had undergone a drug-and-alcohol assessment and a psychological evaluation, and he had engaged in the Batterer's Intervention Prevention Program (BIPP) classes. Spears explained that the drug-and-alcohol assessment is a "self-reporting evaluation" and that because Father had indicated no drug use, no services were recommended.

Spears testified that her concerns about Father related to his drug use, his living environment, and his anger. Regarding Father's anger, Spears explained that he had cursed, yelled, and screamed at her for things that were not within her control. Spears explained that such behavior is concerning "[b]ecause children will emulate whatever they see. The parents are the first teachers, so they teach children how to problem solve and how to deal with stressful situations."

Spears testified that Father and Mother had attended only two visits from May to October 2025; they had missed eight to ten visits during that time because their

11

vehicle could not make the two-and-a-half hour trip. Spears offered Greyhound bus tickets, but Father and Mother did not want to ride the bus because it would have been uncomfortable for Mother, who was in her third trimester.[14]

According to Spears, Father did not provide proof of employment or his employer's name but said that he was a mover.

Spears did not have concerns about the physical appearance of the home where Father and Mother lived with his mother and another individual, but she was concerned about the home's occupants. Spears believed that the home had adequate room for the children.

Spears testified that at the time of the October 2025 trial, John, Roger, and Lacy were still living together in the same adoption-motivated foster home, and Kenneth lived in another home.[15] Spears agreed that one of the children had made an outcry of physical abuse that had occurred in the foster home, and a safety plan was put in place in June 2025 prohibiting the foster parents from physically disciplining the children. Spears said that at the time of the October trial, there were no concerns at the homes where the children were placed.

---

[14]Spears testified that Mother had since given birth and that due to her drug use while pregnant, there was an open investigation as to that child who was still residing with her.

[15]Spears said that the Department was working on a plan to transition Kenneth back into the foster home with his siblings, but he had not been moved at the time of the October trial.

Spears agreed that Paternal Grandfather and Maternal Grandmother, both of whom lived out of state, were willing to take custody of the children but that a home study had not been completed on either of them because two of the children needed updated psychological evaluations. Spears said that Paternal Grandfather and his wife were adoption motivated but that Maternal Grandmother was "on the fence" about adoption. If the Department's termination petition were granted, the plan was "[t]o receive the approved [Interstate Compact for the Placement of Children home study] for either grandparent and proceed with placement" and have the children adopted by either approved grandparent.

Mother testified at the October trial that she and her baby were living with Paternal Grandmother, Father's step-dad, and Father. Mother testified that she did not have any current mental-health diagnoses and was not taking any medications.

Mother said that they paid bills by Father's "doing his moving jobs, side jobs, anything that [they] could find on Craigslist" and by her braiding hair, selling food, and babysitting their niece and nephews. They received food stamps, were on Medicaid, and did not have to pay rent. Mother said that her vehicle needed fuel injectors, had "engine problems," and was not safe to drive long distances but claimed that it would be safe to drive when taking the children to school or to their appointments.

Mother believed that she had taken responsibility for her actions. But then she said that she did not do anything wrong and was not responsible for her children

13

coming into the Department's care. She blamed the removal on an investigator who had sought the children's removal after they were dropped off at a fire station. Mother ignored that the person she had chosen to care for her children had dropped them off at a fire station. Mother blamed her positive drug tests on her "environment." When asked to explain, she said, "It could be anywhere. It could be anything that I've touched. It could be money. It could have been somewhere that I was laying. It doesn't have to necessarily be in the home. I did not state that it was in that home." Mother agreed that if her children were in that same environment and tested positive for drugs, that would be a dangerous environment for them. But she said that they could test positive anywhere. Mother did not believe that she had done anything that had endangered the physical health and safety of her children. Mother asked for the trial court to deny the termination and to allow the children to live with her and Father.

Father testified at the October trial and provided an update on his service-plan completion and his employment and housing since his release. He had taken eleven or twelve of the fifteen BIPP classes but did not think that he needed them.

Father said that he had been honest in his drug assessment and that he did not use cocaine. He testified that he had not used drugs since his release.

Father disagreed that he had missed eight to ten visits with the children and claimed that he had attended more than half of the visits. He said that some of the missed visits were due to transportation issues but blamed others on Spears. Father

14

said that the children were "ecstatic" to see him when he had his first in-person visit after his release and that they were still excited to see him every visit thereafter. He admitted that the kids were "always wild" during the visits and that he had to do some redirecting.

Father was working five days a week doing various jobs and made approximately $100 to $200 per day. Father had beds for the children at his mother's house and believed the home would be a safe environment for his children. Father said that he was able to meet all of his financial needs, that he was providing food for all who lived in the house, and that he could provide for his children if they were returned to him. He was also saving money to put toward having his own place to live but said that he would not have enough saved until the middle of 2026.

Father said that he and Mother were responsible for the children coming into the Department's care and that it was wrong for Mother to say that it was not her fault. But when asked who was responsible for Father's failure to complete his service plan, he said it was Spears's fault. And when asked whose fault it was that Father had twice tested positive for cocaine, he blamed it on his "working environment." Father further said that he felt his children would be safe in an environment where there was an exposure to cocaine.

Father asked for all four children to be returned to him even though he was not John's biological father. Father answered affirmatively when asked if he had the means and ability to get his children to school and to take them to doctor's

15

appointments if they were returned to him. He said that they had no needs that he could not meet. Father asked for Paternal Grandfather to be named as the children's managing conservator if the trial court did not return the children to Father.

The children's ad litem reported

> that [the] kids are doing well right now in their placements. I would prefer that they be together[,] and I am appreciative to the Department for continuing to look for family where these kids could be placed. . . . [R]ight now the kids are separated. One is with one[,] and . . . the other three are with another. But . . . they are doing well in their placement, and so that's . . . the extent of my report.

### D.    Outcome

After hearing the evidence, the trial court terminated Father's and Mother's parental rights based on the endangerment grounds and the best-interest ground.

## III.  Father's Appeal

In a single issue, Father argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Father's brief focuses on him and makes no mention of the children's status (e.g., what therapies they are receiving, how they are doing in school, how they have improved in foster care, etc.). Looking at all the evidence through the best-interest factors and applying the standard of review, we hold that sufficient evidence supports the trial court's best-interest finding.

16

### A. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*,

17

283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18--19.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89

18

S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs[,] . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that

19

termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

### 1. The Children's[16] Desires

As to the first *Holley* factor, the children did not testify at any of the trial settings. Father testified that the children were excited to see him at the few visits that he attended after his release from prison in late April 2025. But the Department presented circumstantial evidence of Roger and Lacy's desires with Spears's testimony that they were bonded to their foster parents with whom they had lived since November 2023 when they came into the Department's care. Thus, the factfinder could have considered the evidence of Roger and Lacy's bond with their foster family as "a reasonable proxy for [Roger and Lacy's] desires." *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also In re E.T.*, No. 02-25-00545-CV, 2026 WL 179594, at *7 (Tex. App.—Fort Worth Jan. 22, 2026, no pet. h.) (mem. op.); *In re O.O.*, No. 05-24-00456-CV, 2024 WL 4403748, at *7 (Tex. App.—Dallas Oct. 4, 2024, pet. denied) (mem. op.). As for Kenneth, the record showed that his behavior had improved; that he was well cared for by his therapeutic foster family and was doing "really well"; and that Father had been incarcerated for most of Kenneth's life, thus having spent little time with him. *See In re M.D.M.*, 579 S.W.3d

---

[16]All references to "children" in this section are only to Father's children: Roger, Kenneth, and Lacy.

20

744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."). The trial court was entitled to conclude that this factor weighed in favor of termination.

### 2. The Children's Emotional and Physical Needs and the Emotional and Physical Dangers to Them

With regard to the children's present and future emotional and physical needs and the present and future emotional and physical dangers to them,[17] the record reflects that Roger and Kenneth were enrolled in behavioral therapy, that Kenneth was taking medication to assist with his behavior, and that Roger's and Kenneth's behavior at school had improved since being in foster care. The trial court could have reasonably inferred from Father's repeated history of incarceration that his confinement-causing conduct would likely continue and that he could not meet the children's current and future physical and emotional needs. *See E.T.*, 2026 WL 179594, at *8. Moreover, the record demonstrated that Spears had concerns about

---

[17]With regard to the second and third factors, this court has previously noted, "Children need long-term safety and stability." *In re V.S.*, No. 02-22-00063-CV, 2022 WL 2252775, at *4 (Tex. App.—Fort Worth June 23, 2022, pet. denied) (mem. op.) (first citing Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); then citing *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); and then citing *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied)).

Father's anger issues and drug use. Father was willing to endanger his children by exposing them to cocaine. His August 2025 drug test was positive for cocaine in an amount higher than his May 2025 drug test; Mother tested positive for cocaine in June 2025 and had refused all other drug tests, which were presumed positive; and he planned to have the children live with him, his mother, and Mother—all three of whom had exhibited issues with drugs; yet, Father did not see this as a problem. These factors also weigh in favor of termination.

### 3.      Parental Abilities of Those Seeking Custody

As to Father's parental abilities, by virtue of his imprisonment, he had left the children with Mother despite his awareness of her mental-health issues (including her tendency to run away in stressful times) and her drug use. Father believed that Mother had never put the children at risk even though they had come into the Department's care because of her failure to care for them. And Father was not able to see how it would be dangerous for the children to be in an environment where they could be exposed to cocaine.

The record reflected that the adoption-motivated foster parents had been able to meet two of Father's children's physical, emotional, and financial needs and that they would continue to do so even if Kenneth were returned to their home. The one reported instance of physical discipline in June 2025 in the foster home had been addressed with a safety plan, and there were no other reported incidents.

No one put on evidence as to the parental abilities of the relatives in California who were seeking custody.

The trial court was entitled to conclude that this factor weighed in favor of termination.

### 4. Programs Available to Promote the Children's Best Interest

With regard to the programs available to assist Father to promote the children's best interest, the record demonstrates that he took advantage of the services offered to him. But the Department had concerns about whether he had been honest as to his drug assessment on which he reported no drug use when he twice tested positive for cocaine after his release from prison. The trial court was entitled to conclude that this factor weighed slightly in favor of termination.

### 5. Plans for the Children

Father's plans were for the children to live with him, his mother, and Mother in his mother's home despite that there were known drug users in the home. As to the Department's plans for the children, Spears testified that the plan was termination of Father's parental rights and adoption by family in California, pending updated psychological evaluations for the children, or by the adoption-motivated foster parents who were willing to adopt all four children. This factor weighs in favor of termination.

### 6. Stability of the Home and Proposed Placement

With regard to the stability of Father's home, the record reflects that he had only been out of prison for approximately six months at the time of the October trial setting and was therefore unable to demonstrate more than six months of stability. Meanwhile, the adoption-motivated foster parents had provided a stable, drug-free home for two of Father's three children (and their half-sibling) for almost two years. This factor weighed in favor of termination. *See In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.) (holding termination to be in child's best interest despite mother's lifestyle improvements and eventual compliance with service plan); *In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that a parent's "recent turnaround" and compliance with a service plan are factors that should be considered when determining best interest but are not solely determinative).

### 7. Acts and Omissions, as Well as Excuses

Regarding Father's acts or omissions indicating that the existing parent–child relationship is not a proper one, we have thoroughly detailed those above under various other factors. As for any excuses for Father's acts or omissions, he contended that his May 2025 drug test was positive due to "someone whom he had been around" and to his "working environment." Father said that he had missed some visits due to transportation issues and blamed some missed visits on Spears. He also

24

said it was her fault that he had not completed his service plan. The trial court was entitled to conclude that these factors weighed in favor of termination.

### 8. Factors Weigh in Favor of Termination

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights to Roger, Kenneth, and Lacy was in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re G.M.D.*, Nos. 01-25-00609-CV, 01-25-00940-CV, 2026 WL 233139, at *13 (Tex. App.—Houston [1st Dist.] Jan. 29, 2026, no pet. h.) (mem. op.) (holding that evidence supported trial court's best-interest finding because mother's criminal activity caused her to be away from her children and subjected them to a life of uncertainty and instability); *In re V.V.*, 349 S.W.3d 548, 554, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc op. on reh'g) (stating that criminal activity that exposes a parent to incarceration is conduct that endangers child's physical and emotional well-being and supports the best-interest finding). Accordingly, we overrule Father's sole issue challenging the sufficiency of the evidence to support the trial court's best-interest finding.

25

## IV. Mother's Appeal

Mother's court-appointed appellate attorney filed a brief averring that after diligently reviewing the record, he believes that the appeal is frivolous. *See* 386 U.S. at 744–45, 87 S. Ct. at 1400; *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Mother did not file a response. The Department, in its brief responding to Father's brief, stated in a footnote that it agreed with Mother's appellate counsel that she has no meritorious grounds upon which to advance an appeal and that because she has not pointed to any arguable grounds for relief, "the Department will not reply to the *Anders* brief."

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* brief, we agree that Mother's appeal is frivolous. We find nothing in the record that might arguably support her appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).

## V.  Conclusion

Having overruled Father's sole issue and having held that nothing in the record might arguably support Mother's appeal, we affirm the trial court's judgment terminating Father's parental rights to Roger, Kenneth, and Lacy and Mother's parental rights to John, Roger, Kenneth, and Lacy.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  March 26, 2026